Estate of Augusta Reta Davidson, Deceased, The Fourth National Bank in Wichita, Wichita, Kansas, Executor v. Commissioner.
Estate of Augusta Reta Davidson v. Commissioner
Docket No. 5669.
United States Tax Court
1945 Tax Ct. Memo LEXIS 53; 4 T.C.M. (CCH) 972; T.C.M. (RIA) 45329; October 26, 1945
C. G. Yankey, Esq., and Verne M. Laing, Esq., 724 Fourth Nat. Bank Bldg., Wichita, Kansas, for the petitioner. Roy C. Hormberg, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves a deficiency of $65,462.50 in estate tax. All of the issues raised by the petition except one were settled by stipulation. The issues agreed upon in the stipulation will be reflected in the recomputation to be filed under Rule 50. The issue in controversy is whether error *54 was committed by the respondent in including in gross estate the amount of $105,275.58, representing the proceeds of five insurance policies. Material portions of the stipulations of fact filed by the parties will be set forth with findings of fact made from other evidence. Findings of Fact The petitioner is the duly qualified executor of the estate of Augusta Reta Davidson, who was born April 22, 1873, and died testate on October 16, 1941, a resident of Wichita, Kansas. The estate tax return was filed with the collector for the district of Kansas. The decedent was the widow of William Davidson, who died testate in February 1917. The second and fourth paragraphs of his will read as follows: "Second. I will, devise and bequeath to my beloved wife, Reta Davidson, for the term of her natural life, and after her death to my niece, Agnes Pottenger, the sum of Fifteen Thousand Dollars ($15,000.00). "Fourth. I will, devise and bequeath to my beloved wife, Reta Davidson, for the term of her natural life, and after her death, to my dear John Pottenger, called by me "Little Jack Pottenger," son of my niece Agnes Pottenger, the sum of Fifty Thousand Dollars ($50,000.00). I hereby express *55 the desire that, to expedite matters and as a reminder to her executor, my wife make a will and in it provide for the payment to said John Pottenger of this sum of Fifty Thousand Dollars ($50,000.00), and in it also provide for the payment to said Agnes Pottenger of the legacy of Fifteen Thousand Dollars ($15,000.00), mentioned in the paragraph of this will marked Second; and also that she remember her sister 'Munsey' in her said will." The decedent had no children and never adopted any children. In 1910 she began to make gifts of money and personal property at irregular times to her three sisters, Grace T. Gallie, Mina Irish and Mollie Hagenbuch, her brother Carl J. Rockser, and niece, Grace Lawrence, and later to a nephew, Donald Rockser, born in 1916. These individuals were her closest relatives. Commencing in 1926 the gifts of money were made more regularly, at times by a monthly check. The payments made from 1926 to 1941, inclusive, as evidenced by canceled checks, aggregated $88,466.54. She made gifts of money other than those evidenced by the canceled checks. On October 11, 1932, the decedent transferred certain securities and cash to the First National Bank in Wichita, *56 in trust, with directions to pay out of principal or income $150 monthly each to Grace T. Gallie and Mina Irish and $100 monthly each to Mollie Hagenbuch, Carl J. Rockser and Grace Lawrence, in each case for the life of the beneficiary. The interest of each beneficiary in the trust was to cease upon his or her death, except that upon the death of Carl J. Rockser the payment of $100 each month to him was to be made to his son, Donald Rockser, until the termination of the trust. On April 30, 1936, the trust was amended to provide for monthly payments of $150 to each sister and the brother and $100 to the niece until the trust fund was exhausted, the nephew to receive the share of his father upon the latter's death. On March 28, 1940, the trust was further amended to provide for monthly payments of $75 to each primary beneficiary except Grace Lawrence, who was to receive $50 a month, during the lifetime of the decedent, and upon her death the payments were to be doubled and continued for the life of the respective beneficiaries. To sustain the monthly payments under the trust, the decedent made annual contributions to the trust aggregating $97,700 through 1939, including $35,000 contributed *57 at the time of the creation of the trust. The monthly payments provided for in the trust were made during the remaining life of the trustor. The decedent established joint bank accounts with two of her sisters and her brother in which there were balances aggregating about $27,000 at the time of decedent's death. The decedent applied for and received ordinary life insurance policies on her life as follows: Date
Amount
May 12, 1936
$30,000
June 1, 1936
15,000
October 15, 1936
10,000
October 15, 1936
25,000
October 15, 1936
25,000 Medical examinations were made of the insured by the insurance companies prior to the issuance of the policies. The executor, administrator and assigns of the insured were made beneficiaries of the policies. On June 17, 1936, the sisters and brother of the insured were named beneficiaries, share and share alike, of the first two policies in the total amount of $45,000, and on July 20, 1937, the executors, administrators and assigns of the insured were again named beneficiaries of the policies. All of the insurance was sold at the same time. The insurance agent kept the first two policies below $50,000 to avoid a physical examination *58 of the insured by two separate medical examiners. At the time the policies were issued the decedent was contemplating the execution of a trust with life insurance as the principal for the purpose of carrying out directions of her husband's will to leave a total of $65,000 to John and Agnes Pottenger, and to provide a fund for her sisters and brother. The insurance agent suggested that she create such a trust with the insurance and that she take out an additional $65,000 of insurance to pay death taxes and costs of administering her estate. In January 1937 the decedent, referring to her sisters, brother, and a nephew and niece, told one of her sisters, in substance, that she wanted to have them provided for regularly, that her husband had made a will requesting her to make one, giving $15,000 to Agnes Pottenger and $50,000 to Jack Pottenger, and for those reasons she thought it would be a good idea to establish the insurance trust, as she would feel free and have peace of mind and could go on enjoying the rest of her life, if those two things were taken care of. On July 21, 1937, the decedent irrevocably transferred all of her right, title and interest in the life insurance policies *59 to the First National Bank in Wichita (succeeded by the Fourth National Bank in Wichita on March 28, 1940), in trust, with directions to collect the proceeds of the policies upon her death and thereafter, at a determinable time, to divide the estate into ten equal parts, two parts to be held in trust for each of her three sisters and her brother and one each for her nephew and niece. The sisters and brother were to receive out of the principal and income $250 a month for life and the niece $125 a month for life. Upon the death of any of them the corpus and undistributed income of his or her trust was to go to the trust created for the nephew, who was to receive one-third of the corpus of the trust when he reached 30 years of age, one-half of the remainder five years later and the balance when he became 40 years old, he to receive in the meantime out of the principal and income $200 a month. Any funds distributable to the trust after the nephew attained forty years of age were to be immediately delivered to him free and clear of the trust. If the nephew died before receiving his full distributive share, leaving surviving issue, the trust was to retain the principal and accrued income *60 in trust, in equal shares and make distribution when each child reached the age of 21, and during their minority use income for their maintenance and support. In case the nephew survived the grantor and died without issue before receiving his full distributive share, the trustee was to distribute the corpus and accumulated income in equal shares among the then subsisting trusts for the sisters, brother and niece and upon the death of the beneficiary of any of such trusts, the trust fund was to be distributed in equal shares to the remaining subsisting trusts. Upon the death of the beneficiary of the last subsisting trust, the trustee was to distribute the trust fund to the heirs of the grantor. If there were no such subsisting trusts to take, the trust fund was to go to the grantor's heirs. In the event the nephew survived the grantor and died before receiving his full share of the trust fund leaving issue, and such issue died before reaching 21 years of age, the fund in their trusts was to go in equal shares to the other trusts then subsisting. If no such trusts existed, the trust fund was to go to the grantor's heirs. In case the nephew predeceased the grantor without surviving children, *61 upon the death of any beneficiary of the other trusts, the trust fund in his or her trust was to go in equal parts to the remaining trusts, and upon the death of the beneficiary of the last subsisting trust, the trust fund was to go to the heirs of the grantor. If none of the several beneficiaries survived the grantor, upon her death the trust estate was to go to the heirs of the grantor. All of the beneficiaries survived the decedent. The grantor agreed to pay, and did pay, all of the premiums on the policies. The beneficiaries were authorized to pay the premiums in the event the insured failed to do so. The policies of insurance were assigned to the First National Bank in Wichita at the time of the creation of the trust not only in the trust instrument, but by separate assignments delivered to the respective insurance companies. The grantor, in assigning the insurance policies to the trust, retained no legal interest in the insurance. The right to change the beneficiaries was not retained. Article 4 of the trust instrument read as follows: "The purpose and intention of the Donor in creating this trust is two-fold: First, that of providing a Trust Estate to be administered *62 in accordance with the provisions hereinafter contained for the benefit of the beneficiaries hereinafter named, and Second, that of creating a fund of cash and placing such cash at the disposal of the Trustee for the purpose of purchasing assets, of whatsoever kind and character from the executor, administrator or trustee appointed under the will of the Donor, thereby equipping the Estate of the Donor with a fund of cash which, it is contemplated, will be used by the Executor or administrator of the Estate of the Donor in effecting the termination and distribution of two certain Trusts or Life Tenancies, aggregating Sixty-five Thousand Dollars, which were created under the terms of the will of William Davidson, deceased husband of the Donor, for the life benefit of the Donor, and by virtue of which, upon the death of the Donor, John Pottenger, will be entitled to receive the sum of Fifty Thousand ($50,000.00) Dollars, and Agnes Pottenger the sum of Fifteen Thousand ($15,000.00) Dollars." Article 10 (b) of the trust instrument provides as follows: "Upon the death of the Donor, the Trustee is hereby given the absolute, unqualified and unconditional privilege, right, power and authority *63 to purchase from the executor, administrator or trustee appointed under the will of the Donor any assets of which the Donor dies seized or possessed, whether such assets be common stock, preferred stock, bank stock, notes, mortgages, bonds, debentures, real estate, or otherwise, and as hereinbefore set forth, it is contemplated and expected that the Trustee will make liberal purchases of assets from the executor, administrator or trustee appointed under the will of the Donor for investment of the Trust estate, or the several parts into which the Trust Estate may be divided, and there shall be no restriction whatsoever upon the Trustee in such purchases of assets from the executor, administrator or trustee appointed under the will of the Donor. Anything elsewhere in this instrument contained to the contrary notwithstanding." The decedent spent December 1936 and the first four months of 1937 in California, and her sister, Mollie Hagenbuch, was with her for the first three months. The decedent did not at any time during her visit in California complain to her sister about her health. While in California the decedent and her sister attended picture shows and parties and went out for *64 automobile rides. The religious faith of the decedent was Christian Science. In January 1937, while in California, the decedent was informed by the First National Bank in Wichita that it would be necessary for her to execute a new will, but that she could sign it and the insurance trust when she returned to Wichita. At that time the plans of decedent were to visit her sister in Tacoma, Washington, during the summer and later to visit Spokane, Washington, and take a trip to Canada. In May 1937, while making preparations to make a trip to Tacoma, Washington, the decedent complained of indigestion. She was sent to a hospital about May 20 for a complete physical examination, which disclosed that she had symptoms of pyelitis or pyo-nephrosis and her right kidney was removed on June 3, 1937. Her recovery from the operation was normal and after her release from the hospital on June 24, 1937, her physical condition was better than it was when she entered the hospital. The decedent was in good health and had no physical ailments on July 20 and 21, 1937. The decedent spent the period from about August 1, 1937, to the last of September 1937 in her summer cottage in Colorado with Mollie *65 Hagenbuch. The decedent executed a will in 1932 and thereafter signed several codicils. It was the practice of the First National Bank in Wichita to request clients to rewrite wills having several codicils in order to save probate costs. In accordance with this policy and pursuant to a request of the First National Bank in Wichita, the original will and codicils thereto of the decedent were rewritten as a new will with some additional provisions. The decedent signed the will on July 21, 1937, and executed a codicil thereto on March 23, 1940. The decedent's will made cash bequests aggregating $5,000, and after bequeathing a certain lot for life to two of her sisters, postal savings of $2,500, and jewelry and other personal property (except an item of jewelry), to her sisters, brother and niece, bequeathed in article 16, her residuary estate to the First National Bank in Wichita, in trust, with directions to hold and administer the property in accordance with the terms of the insurance trust created on the same day. The specific bequests, other than money, were returned at a value of about $10,000. Article 2 of the will read as follows: "In accordance with Paragraph Fourth contained *66 in the will of my deceased husband, William Davidson, I hereby remind the Executor of my estate of the fact that I have enjoyed a life interest in and to a fund of Fifty Thousand ($50,000.00) Dollars bequeathed by my husband to John Pottenger, which sum is to be paid to him at the time of my death; and a fund of Fifteen Thousand ($15,000.00) Dollars bequeathed by my husband to Agnes Pottenger, to be paid to her at the time of my death; and I direct that the terms of the two bequests made by my husband, William Davidson, to be effective at the time of my death, be, by my Executor, carried out as promptly as may be convenient." By the codicil executed on March 23, 1940, article 16 of the will was revoked in favor of a provision reading, to the extent material, as follows: "I hereby revoke Article Sixteen in my said Last Will and Testament, and in lieu thereof all the rest, residue and remainder of my property and estate, real, personal or mixed, of every kind, character and description, and wheresoever located which I may own at the time of my death, I devise and bequeath to The Fourth National Bank in Wichita, Wichita, Kansas, as Trustee. Said Trust Estate shall be divided, held, *67 managed, controlled, administered and distributed upon precisely the same terms and conditions as those contained in a certain Irrevocable Life Insurance Trust Agreement executed by me, as Donor, and by the First National Bank in Wichita, as Trustee, on the 21st day of July, 1937, a copy of which Irrevocable Life Insurance Trust Agreement is incorporated herein and made a part hereof as fully as though set out at length in the body of this Codicil." The decedent was admitted to a hospital in Wichita on October 14, 1941, where she died two days later. The immediate cause of her death was apoplexy, due to arteriosclerosis. The estate tax return filed by the petitioner reported gross estate of $374,067.70, less $65,000 for a life interest in the property, and claimed deductions of $30,924.55, including $10,000 for executors' commissions and a like amount for attorneys' fees. No part of the proceeds of the insurance in question here was included in gross estate. The estate was in excess of an amount necessary to pay all claims, taxes, expenses of administration, and the remainder after her life estate in the funds left to the Pottengers by her deceased husband. The transfers of insurance *68 policies to the trust were made in contemplation of death. Opinion In his determination of the deficiency, respondent included the proceeds of the five insurance policies in gross estate, under the provisions of section 811 (c) of the Internal Revenue Code. Upon brief, he contends that the proceeds of the policies are includible in decedent's gross estate as transfers made in contemplation of death, to take effect in possession or enjoyment at or after death, or under which the decedent retained for her life the possession or enjoyment of the property. Each of the several contentions is opposed by the petitioner. We inquire first as to contemplation of death. The test of whether the transfers were made in contemplation of death is the motive of the decedent, and if it is the "sort which leads to testamentary disposition," the transfers come within the purpose of the statute. United States v. Wells, 283 U.S. 102. The beneficiaries of the trust to which the insurance policies were assigned, were the sisters, brother, niece and nephew of the decedent, her closets relatives, and the natural objects of the grantor's bounty. Her contributions *69 to them began in 1910 and continued until her death in 1941. Commencing in 1926, the gifts were made more frequently and for periods by monthly payments. In 1932 the decedent made provision for regular payments to each, except the nephew, for the remainder of their respective lives by creating a trust for that purpose. In addition, the decedent had joint checking accounts with two of her sisters and her brother. These facts disclose a continuous practice of the decedent over a period of 30 years to render financial assistance to her closest relatives. The policy forms a background for her motives in making provision for their welfare after her death. Though the petitioner relies upon a declaration by the decedent as indicating lack of contemplation of death, not only was the declaration made several months before execution of the trust, but we consider it equivocal to some extent, evincing consideration both of life and death. The better and more reliable indication of the decedent's motive in creating the trust is found in the instrument itself, in which the decedent set forth definitely that her purpose in creating the estate was to create a fund out of which to make specified *70 payments regularly to the beneficiaries and to create a fund of cash out of which to pay a total of $65,000 payable, upon her death, to the Pottengers, remaindermen of a bequest by decedent's husband. The decedent's executor or administrator, not the trustee, was charged with the duty of distributing such remainder interests, it being provided that it was contemplated that the trustee would purchase assets from the decedent's estate, thus providing the executor or administrator with the funds necessary to distribute the $65,000; but such purchases were not required by the trust instrument. The petitioners reported a gross estate of $309,000 after deducting a life interest of $65,000 in property she possessed, and without including the proceeds of the insurance policies in question here. Of the $309,000, only $5,000 was the subject of cash bequests to outsiders and except for specific bequests of property of a reported value of about $10,000, the remainder of her estate passed to the trustee of the trust created on July 21, 1937. Thus, substantially all of the decedent's estate passed to a trust for the benefit of the six individuals to whom she had been rendering financial assistance *71 for many years. The record does not disclose that the trust had any funds prior to the receipt of the proceeds of the insurance policies. The only funds it could have had were dividends paid on the policies. In any event, no distributions were to be made by the trustee to beneficiaries until a determinable time after the death of the decedent. There is testimony of record that decedent's will, bequeathing her residuary estate to the trust, contained nothing more than a prior will and codicil thereto, and was prepared to reduce probate costs. The superseded will and codicil are not in evidence and we are unaware of their provisions. It is apparent, however, that since the trust was not established until decedent's last will was executed, the old one contained no bequest to the trust. The will and the trust represent a complete plan of the decedent for the disposition of her estate upon death. The will specifically refers to the trust instrument and as to residuary estate would be incomplete and indefinite without it; for the provisions of the trust must be read to ascertain the beneficiaries of her residuary estate. Read together, we find that the residuary estate and insurance *72 proceeds were destined for trusts for the benefit of the same persons in the same proportions. The plan discloses a motive to create estates after her death with the insurance in question as a part, providing for regular payments for the lifetime of the relatives to whom she had long been rendering financial assistance. The will and the trust had a common objective - provision for financial welfare of the beneficiaries after decedent's death - and they sprang from the same motive. The trust contained nothing that could not have been provided for in the will and was a substitute for testamentary disposition of the policies of insurance. The trust was in the nature of a necessary supplement to the will, and the effect of the plan is no different than it would have been if the insurance had remained payable to decedent's estate and the trust provisions incorporated in decedent's last will. In Igleheart v. Commissioner, 77 Fed. (2d) 704, the court said: * * * a gift is to be regarded as made in contemplation of death where the dominant motive of the donor is to make proper provision for the donee after the death of the donor. * * * The form of the instruments used can *73 not be availed of to avoid the tax effect of testamentary disposition of an inter vivos nature. Goldstone v. United States, 325 U.S. 687 (June 11, 1945). Here, the primary function of the trust was to hold the policies pending the death of the insured. In the Goldstone case the decedent purchased a single premium contract payable upon his death to his wife, or to his daughter, if his wife predeceased him, and if both beneficiaries predeceased him, the proceeds of the contracts were to go to the executors or administrators of the decedent's estate. The insured was required to purchase an annuity contract in connection with the "insurance" contract, under which he was to receive certain payments semi-annually for life. Upon his death his wife was to receive a specified lump sum payment. If she predeceased him, the payment was to go to his daughters, if living, and if not, to his estate. Each contract contained provisions giving the wife power to assign it, change the beneficiaries, surrender it for its cash value and other rights. The insured's wife and daughters survived him and his wife did not assign or surrender the contracts prior to his death. The Court, in *74 holding that the proceeds of the contracts were includible in gross estate as transfers intended to take effect in possession or enjoyment at or after the decedent's death, pointed out that the transaction required such a conclusion, even though the assignee had unrestricted power during the lifetime of the decedent to exercise important incidents of ownership over the contracts. The Court said: Section 302 (c), as demonstrated by Helvering v. Hallock, 309 U.S. 106, reaches all inter vivos transfers which may be resorted to, as a substitute for a will, in making dispositions of property operative at death. * * * In this instance the decedent carefully procured the issuance of two contracts in his wife's name without possessing for a measurable period most of the usual attributes of ownership over the contracts. But this procedure does not conceal the fact that decedent used these contracts as a means of effecting a transfer of approximately $25,000 of his estate to the natural objects of his bounty. Nor does it negative the fact that this inter vivos transfer possessed all the indicia of a testamentary disposition. There was, in other words, a "transfer of property *75 procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another." Chase National Bank v. United States, 278 U.S. 327, 337. Section 302 (c) must therefore be brought to bear. United States v. Tonkin, 150 Fed. (2d) 531, certiorari applied for October 12, 1945, is a reversal of the opinion of the District Court, which petitioner cites to us as applicable here. The decedent in that case transferred certain policies of insurance on his wife to a trust. Later, the trustee, in compliance with a request of decedent's wife under power conferred upon her by the trust instrument, acquired with trust funds single premium insurance contracts on the life of the settlor and at the same time as part of the transaction, the settlor purchased from the same company certain single premium annuity contracts. The income of the trust was payable to the grantor's wife until his or her death, whichever first occurred. If she predeceased him, the income was payable to various beneficiaries during the remaining lifetime of the grantor. Upon the death of the survivor of the grantor and his wife, the corpus was to go to specified *76 individuals, and in case of no surviving remaindermen the corpus would revert to the decedent or his estate by operation of law. The decedent executed his last will a week after creating the trust. The court considered the trust "as merely formalistic and of no substantial consequence" and concluded that the proceeds of the insurance and annuity contracts were includible in gross estate as transfers made in contemplation of death in the light of the principles of the Goldstone case. The facts here require a like answer, and we so hold. It is unnecessary, therefore, to consider further the transfer in trust was one intended to take effect in possession or enjoyment at or after death, within the language of section 811 (c) of the Internal Revenue Code. It is suggested on brief that the $40,000 exemption applies to the insurance proceeds. The policies being upon the life of the decedent and being, prior to the trust instrument, payable to the executors, administrators and assigns of the decedent's estate, and we having held that the transfer in trust was made in contemplation of death, it follows that the insurance proceeds were "receivable by the executor, *77 " and the $40,000 exemption does not apply. Section 811 (g) of the Internal Revenue Code. Igleheart v. Commissioner, supra; Estate of Frank A. Vanderlip, 3 T.C. 358. Decision will be entered under Rule 50.